**SIGNED this 17th day of August, 2012**

_____
Marcia Phillips Parsons
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re | |
| EDWARD BENJAMIN STEFFNER<br>and PAMELA DENISE STEFFNER, | No. 11-51315<br>Chapter 7 |
| Debtors. | |
| HULSING HOTELS TENNESSEE, INC., | |
| Plaintiff, | |
| vs. | Adv. Pro. No. 11-5053 |
| EDWARD BENJAMIN STEFFNER and<br>PAMELA DENISE STEFFNER, | |
| Defendants. | |

## M E M O R A N D U M

Appearances:

| | |
|---|---|
| Jason Brill Shorter, Esq. | Margaret B. Fugate, Esq. |
| Post Office Box 4210 CRS | 114 E. Market Street |
| Johnson City, Tennessee 37602 | Johnson City, Tennessee 37604 |
| _Attorney for Plaintiff_ | _Attorney for Defendants_ |

**Marcia Phillips Parsons, Chief United States Bankruptcy Judge.**   Hulsing Hotels Tennessee, Inc. ("Hulsing") holds a state court judgment against Sleep Quest Diagnostics, LLC ("Sleep Quest").  In this adversary proceeding, Hulsing seeks to hold the debtors Edward Benjamin Steffner, Jr. and Pamela Denise Steffner liable for Sleep Quest's judgment by piercing its corporate veil.  Hulsing also seeks a denial of the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(2)(A), or alternatively, a determination of nondischargeability under 11 U.S.C. § 523(a)(4) and (a)(6).  Presently before the court are Hulsing's and the Debtors' cross motions for summary judgment.  For the reasons set forth below, Hulsing's motion will be denied, and the Debtors' granted.  This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I) and (J).

I.

On May 30, 2011, the Debtors filed a petition for bankruptcy relief under chapter 7 of the United States Bankruptcy Code.  Thereafter, on September 12, 2011, Hulsing timely commenced this adversary proceeding.  On April 27, 2012, Hulsing filed the instant motion for summary judgment as to its piercing the corporate veil and denial of discharge claims.  The motion is supported by excerpts from the Debtors' deposition transcripts, including exhibits to those depositions; bank statements of Sleep Quest and of a related entity, Specialty Respiratory Services, LLC ("SRS"); the Debtors' bank statements and federal income tax returns; a November 3, 2011 letter from attorney Kenneth Hood; and documents in connection with the state court action.

On May 24, 2012, the Debtors filed a response in opposition to Hulsing's motion, as well as their own motion for summary judgment on all claims asserted by Hulsing, including the § 523(a)(4) and (a)(6) claims.  The Debtors' motion is supported by the affidavits of Mr. Steffner and Jana Cole, a former employee of SRS and a contract laborer with Sleep Quest, along with exhibits to those affidavits, including Quickbook banking ledgers for Sleep Quest and SRS, and the loan accounting ledger between the two companies.

The parties have also filed Statements of Undisputed Material Facts and responses thereto. The date for concluding all discovery passed on May 16, 2012, and the trial is presently scheduled for October 2, 2012.  Accordingly, the cross summary judgment motions are ripe for resolution. From a review of the submitted material it appears that the facts are relatively undisputed.  It is the

2

legal significance of these facts, however, that is sharply in dispute.

As set forth in the parties' Statements, Sleep Quest is a Tennessee limited liability company formed in 2006 by Mr. Steffner, its sole member, to engage in polysomnography, or sleep studies to diagnose sleeping and respiratory disorders.  On June 9, 2009, almost two years before the Debtors' bankruptcy filing, Hulsing obtained a state court judgment in the amount of $20,318 against Sleep Quest, arising out of Sleep Quest's use of hotel rooms in Johnson City, Tennessee for sleep studies.  Hulsing's allegations about the Debtors that provide the factual basis for this adversary proceeding pertain not to the events that led to that state court judgment against Sleep Quest, but rather alleged efforts by the Debtors to thwart Hulsing's collection of the judgment.

On July 29, 2009, shortly after it obtained the judgment, Hulsing served a garnishment on Sleep Quest's bank account at GreenBank.  On the day before the garnishment was served, the account had a balance of $5,343.47.   However, on July 29, 2009, $4,886.00 from this account was transferred to the GreenBank account of SRS, another entity owned by Mr. Steffner, leaving an ending balance in Sleep Quest's account of $0.17.  When the garnishment was received and processed at GreenBank's main office on August 3, 2009, there was only $42.43 in Sleep Quest's account, causing the garnishment to be returned for insufficient funds.  In late July and early August 2009, both Sleep Quest and SRS had loan payments due to GreenBank as well as numerous other creditor obligations for which checks were written.

On March 24, 2010, Hulsing served a garnishment on BlueCross and BlueShield ("BCBS"), seeking to obtain insurance reimbursement claims owed by BCBS to Sleep Quest.  BCBS acknowledged that it owed approximately $2,200 to Sleep Quest, listed under the name of Dr. Frederic Seifer, and paid these funds into state court.  Upon learning of the garnishment, Mr. Steffner discussed the matter with GreenBank, which held a perfected lien on Sleep Quest's accounts receivables.  After this discussion, GreenBank filed a motion in state court to quash Hulsing's garnishment.  In an email communication to GreenBank, Mr. Steffner advised GreenBank that Sleep Quest had temporarily stopped filing claims for reimbursement with BCBS.  On June 29, 2010, the state court denied  GreenBank's motion to quash, after which  Sleep Quest filed on July 13, 2010, a motion to pay the Hulsing judgment in installments.  By operation of law, the filing of

both the motion to quash and the motion to pay in installments stayed Hulsing's collection efforts. *See* Tenn. Code Ann. § 26-2-408; Tenn. Code Ann. § 26-2-216(a)(1).  In June, July, and August 2010, Sleep Quest continued to operate and provide sleep study services, for which it received payment by direct deposit from Cahaba GBA, LLC.

During unspecified times, Sleep Quest submitted claims to BCBS under a NPPES (National Plan and Provider Enumeration System) identifier other than its own.  The number used by Sleep Quest belonged to a physician who did not work for Sleep Quest and was not involved in administering the sleep studies.

In February 2011, Sleep Quest went out of business.  SRS, which had been formed in 1998 by Mr. Steffner, its sole member, became inactive in early 2011 because its 10-year term of duration under Tennessee law had run.  On February 10, 2011, Mr. Steffner formed a third entity also named Specialty Respiratory Services, LLC, which engaged in the same business as its namesake—providing durable medical equipment for at-home treatment of sleep disorders.

When the Debtors filed for personal bankruptcy relief in May 2011, they listed in their schedules the business debts of the two defunct entities, Sleep Quest and SRS, regardless of whether there was a personal guaranty of these debts, in order to provide notice to creditors who might assert any personal claim against the Debtors.  At their 11 U.S.C. § 341(a) meeting of creditors, the Debtors denied any personal liability for Sleep Quest and SRS's debts, and on July 12, 2011, they amended their Schedule F to state that they disputed any personal liability for these entities' debts.

Other facts undisputed by the parties are that Mrs. Steffner had no ownership interest in either Sleep Quest or SRS, although she did help out her husband when he needed her, and she "routinely made transfers between Sleep Quest and SRS."  In addition to the business accounts of Sleep Quest and SRS at GreenBank, the Debtors also maintained a personal account at GreenBank. Sleep Quest, SRS, and the Debtors were each indebted to GreenBank on separate loans.  All used the same accounting firm to prepare their tax returns, and all were represented in the state court action by the same attorney. Intra-company transfers of funds between Sleep Quest and SRS are apparent in numerous months, but both companies maintained internal accounting records to document the transfers between the companies and the reasons for the transfers. Sleep Quest and

SRS had different business addresses on file with the Tennessee Secretary of State and operated at different business addresses.

II.

Rule 56 of the Federal Rules of Civil Procedure, as incorporated by Federal Rules of Bankruptcy Procedure 7056, mandates the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986)).

The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S. Ct. 1598 (1970)).  The burden then shifts to the nonmoving party to produce evidence that would support a finding in its favor. *Anderson*, 477 U.S. at 250-52.  In considering the motion, the court must construe all reasonable inferences in favor of the nonmoving party. *Spradlin v. Jarvis (In re Tri-City Turf Club, Inc.)*, 323 F.3d 439, 442 (6th Cir. 2003) (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001)). The party opposing a motion for summary judgment "'may not rest upon mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' The party opposing the motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* at 442-43 (citations omitted).  "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 250.  Stated differently, summary judgment is appropriate "[i]f after reviewing the record as a whole a rational factfinder could not find for the nonmoving party." *Braithwaite*, 258 F.3d at 493 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998)).

This standard does not change when both parties move for summary judgment. *Taft Broad.*

5

*Co. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wily v. United States (In re Wily)*, 20 F.3d 222, 224 (6th Cir. 1994).

III.

### A. *Piercing the Corporate Veil*

Hulsing maintains that the undisputed facts in this case provide a basis for disregarding the corporate veil of Sleep Quest, such that the Debtors are liable for its debts, including Sleep Quest's judgment debt to Hulsing.[1]  As a general rule, members, owners, employees or other agents of a Tennessee limited liability company have no personal liability for the debts or obligations of the company.  *See* Tenn. Code Ann. § 48-217-101(a)(1)); Tenn. Code Ann. § 48-249-114(a)(1)(B). Under an equitable remedy known as "piercing the corporate veil," however, "the separate legal entity of a corporation may be disregarded upon a showing that it is a sham or a dummy or where necessary to accomplish justice." *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. App. 1991). Despite the inapplicability of the remedy's name, the "corporate veil" of a Tennessee limited liability company may also be pierced, utilizing the same standards. *See Starnes Family Office, LLC v. McCullar*, 765 F. Supp.2d 1036, 1049 (W.D. Tenn. 2011).

Tennessee courts have instructed that "[c]onditions under which the corporate entity will be disregarded vary according to the circumstances present in the case." *Muroll Gesellschaft M.B.H.*

---

[1] As set forth in its complaint and in its memorandum filed in support of its summary judgment motion, Hulsing seeks to pierce the veils of both Sleep Quest and SRS, so that it can pursue its claim not only against the Debtors but also against SRS.  Traditionally, the veil of an entity is pierced in order to subject a controlling person to personal liability of the separate legal entity's debts.  *See Mfgs. Consol. Serv., Inc. v. Rodell*, 42 S.W.3d 846, 866 n.12 (Tenn. App. 2000). Thus, to the extent that Hulsing seeks to hold the Debtors liable for Sleep Quest's debt, the request is appropriately characterized as piercing Sleep Quest's corporate veil.  Undeniably, this court has jurisdiction over this dispute because it pertains to claims sought to be asserted against the Debtors. *See Husky Int'l Elec., Inc. v. Ritz (In re Ritz)*, 459 B.R. 623, 632 (Bankr. S.D. Tex. 2011).  However, to the extent that Hulsing seeks to hold SRS liable for Sleep Quest's debts because of the Debtors' alleged misconduct, a type of reverse piercing or alter ego theory, *Rodell*, 42 S.W.3d at 866-67 n.12, this court has no jurisdiction, and SRS is not a party to this proceeding.

6

*v. Tenn. Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. App. 1995).  For example, "[d]iscarding the fiction of the corporate entity, or piercing the corporate veil, is appropriate when the corporation is liable for a debt but is without funds to pay the debt, and the lack of funds is due to some misconduct on the part of the officers and directors." *VP Bldgs., Inc. v. Polygon Grp.*, No. M2001-00613-COA-R3-CV, 2002 WL 15634, *4 (Tenn. App. 2002).  Similarly, the corporate veil will be pierced "where the corporation is created or used for an improper purpose, or where the corporate form has been abused, as when used to an end subversive of the corporation's policy."  *Schlater v. Haynie*, 833 S.W.2d at 925.  The remedy should "be applied with great caution and not precipitately, since there is a presumption of corporate regularity."  *Id.*  "The party wishing to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to this equitable relief."  *Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. App. 2003) (citing *Schlater v. Haynie*, 833 S.W.2d at 925).  In analyzing this issue:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 89 n.13 (Tenn. 2010) (quoting *Fed. Deposit. Ins. Corp. v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)).  No one factor is conclusive,  *Schlater v. Haynie*, 833 S.W.2d at 925, and "it is not necessary that all factors weigh in favor of piercing the corporate veil. It is necessary, however, that the equities substantially favor the party requesting the court to disregard the corporate status."  *CAO Holdings, Inc. v. Trost*, 333 S.W.3d at 89.

Hulsing asserts that several of the *Allen* factors are present in the instant case, warranting summary judgment in its favor on the piercing the corporate veil issue.  Hulsing points out that Sleep Quest and SRS shared the same office building, bank, attorneys, and accountant.  Hulsing also cites

the transfer of funds from Sleep Quest to SRS at the time of Hulsing's garnishment and the alleged interference with Hulsing's garnishment of BCBS funds as evidence of a "diversion of corporate assets . . . to the detriment of creditors." Lastly, Hulsing references the fact that there were the intra-company transfers between Sleep Quest and SRS, that Sleep Quest filed insurance claims with BCBS under a third-party physician's provider number, and that the Debtors listed the liabilities of the two companies on their bankruptcy schedules, all as evidence that the Debtors, Sleep Quest and SRS commingled their assets and liabilities, thereby failing to maintain the appropriate arms-length relationships among the related entities.

The court is unable to conclude that these facts are sufficient to meet the legal standard for disregarding Sleep Quest's "corporate" veil. They do not demonstrate that Sleep Quest was a sham or a dummy, that the corporate form was abused or used for an improper purpose, or that Sleep Quest was unable to pay its obligations due to some misconduct on the part of the Debtors that justifies piercing the corporate veil. Admittedly Sleep Quest and SRS operated out of the same building, albeit in different suites, and used the same bank, attorneys, and accounts. However, the evidence is also undisputed that the two entities were formed at different times for different purposes. It is not unusual or inappropriate for closely-held businesses to utilize the same professionals for convenience. There is no indication in the present case that the professionals and businesses who dealt with the Debtors and the two companies ignored their corporate separateness or treated them as one in the same.

With respect to the intra-company transfers between Sleep Quest and SRS, it is undisputed that both companies maintained internal accounting records to document the transfers between the companies and the reasons for the transfers. According to the Debtors, the transfers were all properly documented loans or repayment of loans, as set forth in the ledgers of each company, which would mean that there would be no overall change in either company's balance sheet as a result of each transfer. While Hulsing disputes the Debtors' characterization of the transfers as "loans," it has come forward with no evidence contradicting this assertion or the Debtors' proof in support. Similarly, as to the July 29, 2009 transfer of $4,886 from Sleep Quest to SRS when Hulsing was attempting to garnish Sleep Quest's bank account, there is no evidence that it was not a loan, or that the transfer resulted in a permanent inability for Sleep Quest to meet its financial obligations, since

8

the depletion in cash caused by a loan from one company to another would be replaced by a note receivable.  It is undisputed as set forth in the parties' Statements of Undisputed Material Facts that in late July and early August 2009 SRS had loan payments due to GreenBank as well as numerous other creditor obligations.  While the timing of this particular loan may be more than coincidental in light of Mr. Steffner's knowledge of Hulsing's garnishment, the court is unable to conclude, in light of all the evidence, that the timing of the loan justifies disregarding Sleep Quest's corporate veil and holding the Debtors liable for Hulsing's debt.

Similarly, the court is unable to conclude that the Debtors' conduct regarding the BCBS garnishment provides a basis for subjecting them to personal liability.  According to the undisputed record, upon learning of Hulsing's garnishment, Mr. Steffner advised GreenBank on May 27, 2010, that he was "just holding Blue Cross claims for right now.  We have up to 120 days to file them without being out of 'timely filing' guidelines."  On that same day, GreenBank filed its motion to quash.  After this  motion was denied on June 29, 2010, Sleep Quest filed on July 13, 2010, a motion for payment of the Hulsing debt in installments, thereby staying the execution until the motion was resolved.  *See* Tenn. Code Ann. § 26-2-408 ("No sheriff or other officer shall conduct an execution sale, and no clerk shall pay out funds received pursuant to an execution or garnishment until the judgment debtor's time has expired for filing a motion to quash, or until a judicial determination has been made on such motion."); Tenn. Code Ann. § 26-2-216(a)(1) ("The filing of such [an installment payments] motion by the debtor shall stay the issuance, execution or return of any writ of garnishment against wages or salary due the judgment debtor or any other funds belonging to the judgment debtor sought to be substituted to the satisfaction or payment of or upon such judgment during the period that such judgment debtor complies with the order of the court.").

There is no indication that these actions resulted in a loss of funds to Sleep Quest.  Merely holding back for a time from submitting claims to BCBS was not illegal or misconduct by Mr. Steffner, assuming that the delay caused no loss to Sleep Quest, and no such loss has been asserted. Nor is it misconduct that Mr. Steffner notified GreenBank of the garnishment, prompting it to file a motion to quash the garnishment.  Merely preferring one creditor over another is not a basis for piercing the corporate veil. *See Schlater v. Haynie*, 833 S.W.2d at 925 (corporate officer's decision to prefer secured creditor did not subject him to personal liability to an unsecured creditor as long

9

as no asset of corporation was fraudulently appropriated for this purpose).  Similarly, the court attaches no significance to the fact that Sleep Quest moved to pay the Hulsing debt in installments, an option that was legally available to it.

As to Sleep Quest's use of a identifier number other than its own, while arguably unusual, there is no evidence that the practice was illegal, fraudulent, or resulted in a diversion or concealment of funds due to Sleep Quest.  To the contrary, it is undisputed that when Hulsing issued its attachment to BCBS for funds owed to Sleep Quest, Hulsing was able to recover the funds owed to Sleep Quest under the identifier number of the physician.  Further, the evidence submitted by the Debtors in the form of Ms. Cole's undisputed testimony is that the use of the third-party number made "no difference in the manner in which claims were submitted, paid or receipts deposited." This testimony is confirmed by Sleep Quest's bank statements and the BCBS subpoena response which indicate that payments made by BCBS under Dr. Siefer's identifier number were deposited in Sleep Quest's bank account.

Lastly in this regard, the court attaches no significance to the fact that the Debtors initially listed the debts of Sleep Quest and SRS in their bankruptcy schedules.  As a general rule, debtors in bankruptcy are cautioned to give notice of their bankruptcy filing to any party that conceivably could have a claim against them.  *See In re Odette*, 347 B.R. 60, 63 (Bankr. E.D. Mich. 2006) .  In this court's experience, it is not uncommon for owners of failed businesses who file for bankruptcy relief to list the names of the business' creditors in the owners' personal filings.  Admittedly, these debts are usually listed as disputed, but the mere fact that the Debtors initially failed to do so is not determinative.  Hulsing does not deny that the Debtors orally corrected this mistake at their meeting of creditors and in subsequent amendments to their schedules.

In conclusion, as to whether Hulsing is entitled to summary judgment on the corporate veil piercing issue, there is not sufficient evidence to overcome the presumption of corporate regularity or to demonstrate that the equities substantially favor Hulsing.  Stated differently, this court is unable to conclude that the evidence supporting Hulsing's claim is so one-sided that it must prevail as a matter of law.  *Anderson*, 477 U.S. at 252.

The court turns next to the Debtors' motion for summary judgment on this same issue.  In

10

addition to their responses to Hulsing's motion, the Debtors point out based on the affidavit of Mr. Steffner that each company had its own source of capital through separate bank loans from GreenBank or capital investments made by Mr. Steffner personally; that each company was formed at different times with different business purposes; and that the companies did not operate out of the same facility, and in fact were prohibited from doing so by Medicare regulations, with site visits performed to verify the companies' distinct locations. According to Mr. Steffner, previously one company was in Suite 201 at 3901 Bristol Highway while the other company was in Suite 202. Similarly, when Sleep Quest's business closed, its business address was 110 E. Mountcastle Dr., Suite #4, Johnson City, Tennessee, while SRS was located in Suite #3 at the same street address. Mr. Steffner also states that while SRS had employees, Sleep Quest utilized independent contractors. And although SRS's employees on occasion did clerical work for Sleep Quest, SRS was compensated by Sleep Quest for the clerical assistance.

As to the intra-company transfers, Mr. Steffner explains that from time to time there were loans between the two companies to deal with cash flow issues, and that these loans were properly recorded on the accounting ledgers of each company and periodically reconciled by certified public accountants. According to Mrs. Steffner's deposition testimony, SRS loaned more money to Sleep Quest than Sleep Quest did to SRS, as Sleep Quest needed more help in meeting its obligations. Regarding the transfer from Sleep Quest to SRS that occurred when Hulsing attempted to garnish Sleep Quest's account, Mr. Steffner states that the attempted levy occurred at the end of the month when bills were routinely paid, including payment on loans to GreenBank, and observe that Sleep Quest continued to use the same account after the attempted levy until it shut down operations in 2011.

With respect to the alleged interference with Hulsing's garnishment of funds due Sleep Quest from BCBS, the Debtors state that Sleep Quest was attempting at the time to negotiate a payment arrangement with Hulsing and that any delay in filing claims with BCBS was because they were awaiting the outcome of GreenBank's motion to quash and Sleep Quest's subsequent motion for installment payments. The Debtors observe that Sleep Quest continued to file claims with BCBS until Sleep Quest went out of business. Lastly, as to Sleep Quest's use of a physician's NPPES identifier number, the Debtors reference the affidavit of Ms. Cole, which explains that the NPPES

11

system had not been implemented at the time of Sleep Quest's formation, and that BCBS, unlike the other insurers, required Sleep Quest to use a physician as a provider in order to process claims.

Based on the undisputed evidence in this case, it is clear to this court that there is no genuine dispute of material fact to be determined at trial on the issue of corporate veil piercing. Although discovery has been completed, Hulsing has failed to come forward with sufficient evidence supporting its contention that the corporate veil of Sleep Quest should be disregarded and the Debtors held personally liable for the Hulsing debt. Contrary to Hulsing's claim, the evidence does not establish that Sleep Quest was not a sham or a fraud. Sleep Quest had assets separate from that of the Debtors and SRS; each company was separately capitalized with separate company records kept, and each had its own operations at its own separate location. There is no indication that the "corporate" formalities were not observed, or that the Debtors abused or used the corporate form of Sleep Quest for an improper purpose. Nor does the evidence establish that Sleep Quest was unable to pay its obligations to its creditors due to misconduct by the Debtors that justifies the imposition of personal liability. Accordingly, the Debtors[2] are entitled to summary judgment on the piercing of the corporate veil issue.[3]

---

[2] The court notes that there is even less evidence that would support holding Mrs. Steffner liable for the debts of Sleep Quest than her husband. She was not a member of the company and does not appear to have been a person in control. Although undeniably she performed some of the clerical work with respect to billing, deposits, and some of the transfers in question, she also testified in her deposition that she only worked in the business on a part-time basis and may not have been present for weeks at a time.

[3] Under Tennessee law, "[i]ssues relating to the piercing of the corporate veil are not ordinarily appropriate for resolution by summary judgment." *CAO Holdings, Inc. v. Trost*, 333 S.W.3d at 89 (citing *Mike v. Po Grp., Inc.*, 937 S.W.2d 790, 795 (Tenn. 1996)); *but see S.E.A., Inc. v. Southside Leasing Co.*, No. E2000-00631-COA-R3-CV, 2000 WL 1449852, at *9 (Tenn. App. Sept. 29, 2000) (affirming trial court's grant of summary judgment finding that there was no basis for piercing corporate veil). However, federal rather than state law governs this issue of procedure. *See Cent. Nat'l Ins. Co. of Omaha v. Dana Corp.*, 900 F.2d 259, 1990 WL 47561, at *2-3 (6th Cir. Apr. 17, 1990) (table op.) (district court properly granted summary judgment pursuant to Fed. R. Civ. P. 56 on corporate veil issue, notwithstanding the caution urged by Tennessee courts), *cited with approval in Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 575-76 (6th Cir. 2008); *see also Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 726 (6th Cir. 2007) (concluding that the district court's grant of summary judgment was appropriate regarding inability to pierce corporate veil); *cf. Wilton*

(continued...)

In light of the conclusion that the corporate veil of Sleep Quest may not be pierced to hold the Debtors liable for Sleep Quest's obligation to Hulsing, Hulsing is not a creditor of the Debtors. Consequently, Hulsing does not have standing to object to the Debtors' discharge. *See* 11 U.S.C. § 727(c) ("The trustee, a creditor, or the United States trustee may object to the granting of a discharge under subsection (a) of this section."). Similarly, Hulsing's request for a determination of nondischargeability under 11 U.S.C. § 523(a)(4) and (6) is no longer viable because the Debtors owe no debt to Hulsing. Nonetheless, the court will proceed to examine each of these issues in the event a reviewing court concludes that this court erred with respect to its piercing the corporate veil determination.

B.  *Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(2)(A)*

Hulsing asserts that the Debtors' discharge should be denied under § 727(a)(2)(A) which provides:

> The court shall grant the debtor a discharge, unless . . . (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A).

As plaintiff, Hulsing bears the burden of proof, *see* Fed. R. Bankr. P. 4005, by a preponderance of the evidence. *See Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir. 1994). Moreover, "the Bankruptcy Code should be construed liberally in favor

---

[3](...continued)
*Corp. v. Ashland Castings Corp.*, 188 F.3d 670, 676 (6th Cir. 1999) (applying Ohio law and concluding that a determination of whether the corporate veil may be pierced can be made at the summary judgment stage). It has been recognized that less caution is needed when summary judgment is being granted to the defendant on a piercing of the corporate veil claim, although, of course, Rule 56's summary judgment standard must still be met. *See WYCQ, Inc. v. Nat'l Music Mktg., Inc.*, No. 3:05-cv-0979, 2008 WL 56027, at *11 n.19 (M.D. Tenn. Jan. 3, 2008) (noting that when the party seeking to prevent piercing has moved for summary judgment, "the rationales counseling hesitancy with regard to ruling on piercing the corporate veil on summary judgment are diminished").

of the debtor." *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000).

As stated by the Sixth Circuit, § 727(a)(2)(A) "encompasses two elements: 1) a disposition of property, such as concealment, and 2) 'a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property.'" *In re Keeney*, 227 F.3d at 683 (quoting *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997)). Further, although not expressly stated in *Keeney*'s two-part test, § 727(a)(2)(A) specifies that the property transferred, removed or concealed be "property of the debtor." *See Estate of Stanford Harris v. Dawley (In re Dawley)*, 312 B.R. 765, 782 (Bankr. E.D. Pa. 2004) (citing *Bank of Chester County v. Cohen (In re Cohen)*, 142 B.R. 720, 725 (Bankr. E.D. Pa. 1992)).

Hulsing makes no allegation that there was a transfer or concealment of the Debtors' property. Instead, Hulsing's § 727(a)(2)(A) argument is based on an alleged concealment and transfer of Sleep Quest's property: Mr. Steffner's decision to hold and not file BCBS claims when faced with Hulsing's garnishment, and the loan transfers from Sleep Quest to SRS, including the July 29, 2009 transfer of $4,886. In its memorandum in support of summary judgment, Hulsing acknowledges the possible factual deficiency in its argument but contends, nonetheless, that "an individual debtor who causes his wholly owned corporation to transfer property may be denied a discharge under § 727." Although there is some limited authority for this assertion, *see Bennett v. Hollingsworth (In re Hollingsworth)*, 224 B.R. 822 (Bankr. M.D. Fla. 1998) (because debtor had absolute control of airplane owned by the debtor's corporation, the court was satisfied that the corporate assets were property of the debtor); *Grant v. Benjamin (In re Benjamin)*, 210 B.R. 203 (Bankr. M.D. Fla. 1997) (debtor's transfer of assets from corporate business that he operated and of which he was 25% shareholder constituted transfer of property of the debtor); this court finds these decisions unpersuasive. *See Lort v. Ferguson Enters., Inc. (In re Lort)*, 347 B.R. 909, 911 (M.D. Fla. 2006) (district court noting that *In re Hollingsworth* and *In re Benjamin* "neither cite nor provide authority for simply disregarding the distinction between a corporation and its shareholders"). It is black-letter law that the property of a corporation or limited liability company belongs to that entity, not the owners of the entity, even if the corporation has only one shareholder or member. *See MCorp Mgt. Solutions, Inc. v. Thurman (In re Thurman)*, 901 F.2d 839, 841 (10th Cir. 1990) (property of the debtor for purposes of § 727(a)(2)(A) is not the same as property in

14

which the debtor has a derivative interest); *In re Lort,* 347 B.R. at 909 (allegation that debtor caused his corporation of which he is sole officer, director and shareholder to transfer property is insufficient to provide a basis for denial of discharge under § 727(a)(2)(A)); *CIT Group/Factoring Mfrs. Hanover, Inc. v. Srour (In re Srour)*, 138 B.R. 413, 419-420 (Bankr. S.D.N.Y. 1992) (debtor is entitled to summary judgment on creditor's § 727(a)(2)(A) claim that is based solely on allegedly fraudulent transfers of assets owned by his corporation, since property of the debtor under this provision means property in which the debtor has a direct proprietary interest).

There appears to be two possible exceptions that would permit conduct regarding non-debtor property to be the basis for denial of discharge under § 727(a)(2). The first is when there has been a finding that the debtor is the alter ego of his wholly-owned corporation or similarly a reverse piercing of the corporate veil such that the assets of the corporation are in effect the assets of the shareholder. *See Piscuulli v. T.S. Haulers, Inc. (In re Piscuulli)*, 426 B.R. 52, 60-62 (E.D.N.Y. 2010); *In re Diloreto,* No. 04-CV-1326, 2006 WL 2974156 (E.D. Pa. Oct. 13, 2006); *Freelife Int'l, LLC v. Butler (In re Butler)*, 359 B.R. 356, 2007 WL 866660, *4-5 (B.A.P. 10th Cir. Mar. 19, 2007) (table opin.); *United States Trustee v. Zhang (In re Zhang)*, 463 B.R.66, 79-80 (Bankr. S.D. Ohio 2012); *Compton v. Bonham (In re Bonham)*, 224 B.R. 114, 116 (Bankr. D. Alaska 1998); *see also Jiminez v. Rodriguez (In re Rodriguez)*, No. 06-01119, 2008 WL 3200215, *7 (Bankr. S.D.N.Y. Aug. 5, 2008) (recognizing principle but concluding that there was no evidence that debtor was in fact a shareholder of the corporation or that the corporate formalities had been disregarded); *but see Miller v. Scott (In re Scott)*, 462 B.R. 735, 741-43 (Bankr. D. Alaska 2011) (concluding that § 727(a)(2) is limited to transfers of property in which the debtor has a direct proprietary interest, and rejecting alter ego exception except in egregious circumstances). Under Tennessee law, the alter ego analysis is the same as piercing the corporate veil. *See Capital Mgt. Partners v. Eggleston*, No. W2004-01207-COA-R3-CV, 2005 WL 1606066, *10-11 (Tenn. App. July 7, 2005) (applying *Allen* factors to alter ego assertion). Consequently, this court's earlier rejection of Hulsing's piercing the corporate veil argument precludes the use of the alter ego exception as the basis for denying the Debtors' discharge under § 727(a)(2)(A).

The second exception that would permit a debtor's conduct involving property other than his own to establish the elements of § 727(a)(2) is provided by the Bankruptcy Code itself. Under

§727(a)(7), a debtor who has committed an act described in § 727(a)(2) in connection with an insider who is also a debtor in bankruptcy may be denied a discharge.  *See* 11 U.S.C. § 727(a)(7).  "Insider" is defined in 11 U.S.C. §101(31)(A)(iv) to include a "corporation of which the debtor is a director, officer, or person in control."   Thus, in the Sixth Circuit case of *In re Adams*, an individual debtor was denied a discharge for transferring property of a corporation controlled by him where the corporation was also a debtor in bankruptcy.  *In re Adams*, 31 F.3d at 389.  In the present case, Sleep Quest has not filed for bankruptcy relief so this avenue as a basis for relief under § 727(a)(2)(A) is unavailable to Hulsing.  In conclusion, because Hulsing's allegations of transfer and concealment do not involve property of the Debtors, and do not otherwise fall within the two exceptions to this requirement, Hulsing's § 727(a)(2)(A) claim must fail.  Consequently, the Debtors are entitled to summary judgment on this issue.[3]

---

[3] The court observes that Hulsing's § 727(a)(2)(A) claim has potentially other fatal flaws. Section 727(a)(2)(A) prohibits dispositions of property within one year of a debtor's bankruptcy filing, yet the transfer of $4,886 from Sleep Quest to SRS took place on July 29, 2009, more than one year before the Debtors filed bankruptcy on May 30, 2011.  In recognition of this deficiency, Hulsing argues for the first time in response to the Debtors' motion for summary judgment that the Debtors' actions constituted a continuing concealment.  *See In re Keeney*, 227 F.3d at 684 ("[A] transfer made and recorded more than one year prior to filing may serve as evidence of the requisite act of concealment where the debtor retains a secret benefit of ownership in the transferred property within the year prior to filing.");  *Pinnacle Tech. Res., Inc. v. Spencer (In re Spencer)*, 359 B.R. 357, 2006 WL 3539295, *5 (B.A.P. 6th Cir. Dec. 8, 2006) (table op.) (quoting *Rosen v. Benzer*, 996 F.2d 1527, 1531 (3d Cir. 1993)) ("The doctrine does not negate the 'act' requirement of § 727 but merely recognizes that a failure to reveal property previously concealed can, in some circumstances, properly be considered culpable conduct during the year before bankruptcy warranting a denial of discharge.").  Although it is not clear what secret benefit of ownership the Debtors retained within the required one-year span, other than presumably what interests they had in the two companies, it is unnecessary for the court to resolve this issue in light of its ruling regarding § 727(a)(2)(A)'s other problems.

As to Hulsing's complaint about the BCBS receivables, Hulsing argues that Mr. Steffner's decision to hold off on submitting claims to BCBS while Hulsing's garnishment was outstanding constituted a "concealment" under § 727(a)(2)(A).  According to Hulsing, because of Mr. Steffner's actions, Sleep Quest did not receive any remittances from BCBS from May 2010 to September 2010, thereby satisfying the time requirement of § 727(a)(2)(A) that the concealment occur within one year of the Debtors' May 30, 2011 bankruptcy filing.

"[C]oncealment as used in § 727(a)(2)(A) includes the withholding of knowledge of an asset
(continued...)

C.  *Nondischargeability Pursuant to 11 U.S.C. § 523(a)(4)*

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  In Hulsing's complaint, the only cause of action asserted under this provision is for fraud or defalcation while acting in a fiduciary capacity.  Specifically, Hulsing asserts that under Tennessee law, an officer or director of an insolvent corporation serves in a fiduciary capacity to ensure that corporate assets are properly managed or, alternatively, that an officer or director has a fiduciary duty to distribute property of a dissolved limited liability company according to a statutorily defined plan.  In its response to the Debtors' motion for summary judgment, Hulsing abandons the former assertion, recognizing that the Tennessee Supreme Court has held that an individual creditor of an insolvent corporation may not bring a direct claim against the corporation's officers and directors for breach of fiduciary duty. *See Sanford v. Waugh & Co.*, 328 S.W.3d 836 (Tenn. 2010).  Notwithstanding this recognition, Hulsing continues to maintain that its alternative argument concerning the responsibility of a corporate officer to properly distribute property of a dissolved corporation provides a basis for nondischargeability under § 523(a)(4) as a defalcation by a fiduciary.  Additionally, Hulsing now argues that the transfer of funds between Sleep Quest and SRS was an embezzlement under § 523(a)(4).  Each of these two bases will be addressed in turn.

---

[3](...continued)

by the failure or refusal to divulge information required by law to be made known." *Buckeye Retirement Co. v. Swegan (In re Swegan)*, 383 B.R. 646, 654-55 (B.A.P. 6th Cir. 2008); *see also* 6 *Collier on Bankruptcy* ¶ 727.02[6][b] (16th ed. 2012) (concealment includes "placing assets beyond the reach of creditors").  However, there is no evidence in this case that knowledge of the asset, i.e., insurance claims to be filed with BCBS, was withheld from Hulsing.  Rather, the record is clear that both parties were aware of the BCBS garnishment and were actively litigating the validity of the garnishment prior to and during the majority of the one-year period preceding the Debtors' bankruptcy filing on May 30, 2011.  In fact, the litigation over Sleep Quest's motion to pay in installments continued until Sleep Quest withdrew its motion on March 23, 2011.  Nor does the evidence establish that the BCBS receivables were placed "beyond the reach of creditors."  Sleep Quest still had the assets, its claims against BCBS, even though it was not submitting them for payment.  And, pending the outcome of the parties' garnishment litigation, Hulsing's garnishment was stayed such that it could not have garnished the receivables, even if Sleep Quest had not delayed in processing them for payment.

The court turns first to Hulsing's defalcation by a fiduciary claim. To establish a nondischargeable debt for defalcation, the preponderance of the evidence must establish "(1) a preexisting fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss." *Bd. of Trs. of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci)*, 493 F.3d 635, 639 (6th Cir. 2007) (quoting *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005)). A narrow interpretation of fiduciary is applied for purposes of § 523(a)(4), however, requiring "an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 180 (6th Cir. 1997) (citing *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir. 1996)). What constitutes an express or technical trust is governed generally by state law. *Rowland v. Walls (In re Walls)*, 375 B.R. 399, 405 (Bankr. S.D. Ohio 2007) (citations omitted).

Hulsing asserts that Tennessee law creates a type of technical trust in assets of an insolvent limited liability company. The Tennessee Revised Limited Liability Company Act sets forth a plan for the distribution of assets following the dissolution of a LLC, whereby assets of a dissolved LLC are to be distributed first to its creditors. *See* Tenn. Code Ann. § 48-249-620. In the event assets are distributed without compliance with this plan, under Tenn. Code Ann. § 48-249-611(d)(2) a creditor may pursue recovery of its pro rata share of the assets against a member of the dissolved LLC, to the extent the member has received a distribution of the assets. Hulsing acknowledges that this statutory scheme does not reference a trust or fiduciary duties, but maintains nonetheless that the effect of the scheme is the creation of a trust relationship.

As explained by Judge Richard Stair Jr. of this court:

> Express trusts are created "by the direct and positive acts of the parties, by some writing, deed, or will or by the action of a court in the exercise of its authority." *Jackson v. Dobbs*, 154 Tenn. 602, 290 S.W. 402, 404 (1926) (quoting *Lafferty v. Turley*, 35 Tenn. 157, 163 (1855)). Nevertheless, "the applicable state law creating a fiduciary relationship must clearly outline the fiduciary duties and identify the trust property" and if it does not "clearly and expressly impose trust-like obligations on a party, the court should not assume that such duties exist and should not find that there was a fiduciary relationship." *Crowe v. Moran (In re Moran)*, 413 B.R. 168, 186 (Bankr. D. Del.2009); *accord Tex. Lottery Comm'n v. Tran (In re Tran)*, 151 F.3d at 342–43. . . .
>
> "At a minimum, there must be a grantor or settlor who intends to create a

trust; a corpus (the subject property); a trustee; and a beneficiary. The trustee holds
legal title and in that sense, owns the property, holding it for the benefit of the
beneficiary who owns the equitable title. While the grantor may retain either of these
interests, no one may solely hold both as the purpose of separating the two would be
defeated." *Myers v. Myers*, 891 S.W.2d 216, 218 (Tenn. Ct. App.1994).  Similarly,
technical trusts are defined as "obligations arising out of a confidence reposed in a
person to whom the legal title of property is conveyed, that he will faithfully apply
the property according to the wishes of the creator of the trust," *Knox County v.
Fourth & First Nat'l Bank*, 181 Tenn. 569, 182 S.W.2d 980, 984 (1944) (quoting
*Jackson v. Dobbs*, 154 Tenn. 602, 290 S.W. 402, 405 (1926)), and "are created by
an agreement between the parties to impose a trust relationship but may also be
created by a statute that specifically imposes fiduciary obligations on a party."
*Smallwood v. Howell (In re Howell)*, 178 B.R. 730, 732 (Bankr. W.D. Tenn.1995).

*Tenn. Educ. Lottery Corp. v. Cooper (In re Cooper)*, 430 B.R. 480, 494-95 (Bankr. E.D. Tenn.
2010).

Applying the criteria for express and technical trusts to the present case, there is no
indication in the Tennessee Revised Limited Liability Company Act of an intent to create an express
or technical trust relationship between a limited liability company and its creditors.  No language
establishes a trust *res* in the dissolved company's assets or requires that those assets be held as a
trust fund.  Similarly, no statute imposes fiduciary obligations on a party, notwithstanding the
specified distribution scheme. Thus, this court is unable to conclude that either an express or
technical trust is created by the statutes in question.

This court does note that the priority scheme favoring creditors in the event of a dissolved
entity originated as a common law principle known as the "trust fund doctrine."

Under this doctrine, as it has been applied in Tennessee, the creditors of an insolvent
or dissolved corporation "are entitled in equity to payment of their debts before any
distribution of corporate property is made among stockholders," and these creditors
also possess "a right to follow its assets or property into the hands of anyone who is
not a holder in good faith in the ordinary course of business."

*Kradel v. Piper Indus., Inc.*, 60 S.W.3d 744, 756 (Tenn. 2001) (quoting *Jennings, Neff & Co. v.
Crystal Ice Co.*, 159 S.W. 1088, 1089 (Tenn. 1913)).  Though trust language is utilized, it has been
uniformly recognized that this usage is for purposes of analogy only and should not be viewed as
creating an actual trust in the assets of a dissolved corporate entity.  *See Hollins v. Brierfield Coal
& Iron Co.*, 150 U.S. 371, 381-82, 14 S. Ct. 127 (1893) ("While it is true language has been

19

frequently used to the effect that the assets of a corporation are a trust fund held by a corporation

for the benefit of creditors, this has not been to convey the idea that there is a direct and express trust

attached to the property. . . . [T]hey 'are not, in any true and complete sense, trusts, and can only be

called so by way of analogy or metaphor.'"); 7 *Collier on Bankruptcy* ¶ 1108.10 (16th ed. 2012)

("The trust fund doctrine is an analogy and is not, and should not be, interpreted literally; the assets

of an insolvent corporation are not an actual trust, and the directors are not actually trustees whose

conduct is governed by the very strict fiduciary standards of the law of trusts."); 15A *Fletcher*

*Cyclopedia of the Law of Corporations* § 7373 (2012) ("To the extent that the trust fund doctrine

is stated as creating an enforceable trust in favor of a corporation's creditors, the doctrine has been

repudiated.").   Therefore, this court rejects the suggestion that the trust fund doctrine constitutes an

express or technical trust for purposes of § 523(a)(4).   *See Swimmer v. Moeller (In re Moeller)*, 466

B.R. 525, 533-34 (Bankr. S.D. Cal. 2012) (concluding that the trust fund doctrine does not establish

an express or technical trust for purposes of § 523(a)(4)); *Econ. Dev. Growth Enters. Corp. v.*

*McDermott (In re McDermott)*, 434 B.R. 271, 281 (Bankr. N.D.N.Y. 2010) (same); *Melquiades v.*

*Hill (In re Hill)*, 390 B.R. 407, 412 (B.A.P. 10th Cir. 2008) (concluding that a provision of

Oklahoma General Corporation Act regarding dissolution procedures did not create a trust sufficient

for purposes of § 523(a)(4)); *Kapila v. Talmo (In re Talmo)*, 175 B.R. 775, 778 (Bankr. S.D. Fla.

1994) (reaching similar conclusion under Florida law).

Turning next to Hulsing's embezzlement argument, the Sixth Circuit Court of Appeals

defines embezzlement for purposes of § 523(a)(4) as:

> the fraudulent appropriation of property by a person to whom such property has been
> entrusted or into whose hands it has lawfully come." *Gribble v. Carlton (In re*
> *Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn.1982) (quoting *Moore v. United*
> *States*, 160 U.S. 268, 269, 16 S. Ct. 294, 295, 40 L.Ed. 422 (1895)).   A creditor
> proves embezzlement by showing that he entrusted his property to the debtor, the
> debtor appropriated the property for a use other than that for which it was entrusted,
> and the circumstances indicate fraud. *Ball v. McDowell (In re McDowell)*, 162 B.R.
> 136, 140 (Bankr. N.D. Ohio 1993).

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996).

Hulsing's embezzlement argument is based on the intra-company loans that occurred

between Sleep Quest and SRS.   According to Hulsing, the increased frequency of the intra-company

transfers in the face of its collection efforts warrants classification of these actions as embezzlement. The deficiency in this argument is that there is no allegation by Hulsing that it had a property interest in the property allegedly embezzled.  As set forth above, to prove embezzlement the creditor must demonstrate that it entrusted its property to the Debtors, who then fraudulently misappropriated the property.  *See, e.g., Aristocrat Lakewood Nursing Home v. Dryja*, 259 B.R. 629, 632-33 (Bankr. N.D. Ohio 2001) (judgment creditor had no interest in funds in bank account of judgment debtor and therefore could not establish embezzlement by niece of debtor that received transferred funds from the account).  Because Hulsing fails to allege it had any property interest in the alleged embezzled funds, its embezzlement claim must fail.

In this regard, the court does note that in connection with its subsequent § 523(a)(6) argument Hulsing claims that the effect of its garnishment was to create a lien on the property in the hands of the garnishee.  *See Eggleston v. Third Nat'l Bank in Nashville (In re Eggleston)*, 19 B.R. 280, 284 (Bankr. M.D. Tenn. 1982).  However, a mere lien or security interest does not rise to the level of ownership sufficient to support a claim under § 523(a)(4)'s embezzlement provision.  *See First Nat'l Bank of Fayetteville v. Phillips (In re Phillips)*, 882 F.2d 302, 304-05 (8th Cir. 1989); *Mutual Mgmt. Servs., Inc. v. Fairgrieves (In re Fairgrieves)*, 426 B.R. 748, 756 (Bankr. N.D. Ill. 2010); *Morganroth & Morganroth, PLLC v. Stollman (In re Stollman)*, 404 B.R. 244, 272 (Bankr. E.D. Mich. 2009); *The Bank of Castile v. Kjoller (In re Kjoller)*, 395 B.R. 845, 851 (Bankr. W.D.N.Y. 2008); *Calumet v. Whiters (In re Whiters)*, 337 B.R. 326, 333 (Bankr. N.D. Ind. 2006); *Everwed Co. v. Ayers (In re Ayers)*, 25 B.R. 762, 774 (Bankr. M.D. Tenn. 1982); *In re Rodriguez*, 2007 WL 543750, at *5-6; *but see Jones v. Hall (In re Hall)*, 295 B.R. 877, 882 (Bankr. W.D. Ark. 2003) (concluding that a secured creditor's collateral may be embezzled for purposes of § 523(a)(4)).  For these reasons, the Debtors are entitled to summary judgment on Hulsing's § 523(a)(4) claims.

### D.  *Nondischargeability Pursuant to 11 U.S.C. § 523(a)(6)*

Under § 523(a)(6), a debt is nondischargeable if it arises out of "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  In order "[t]o block the discharge of a debt under § 523(a)(6), a claimant must show that 1) the debtor's conduct was willful *and* malicious, 2) the creditor suffered an injury to its legal rights, and 3) the

creditor's loss was caused by the debtor's conduct." *CMEA Title Agency, Inc. v. Little (In re Little)*, 335 B.R. 376, 383 (Bankr. N.D. Ohio 2005) (citing *Steier v. Best (In re Best)*, 109 Fed. App'x 1, 5-6 (6th Cir. 2004); *Jones v. Svreck (In re Jones)*, 300 B.R. 133, 139 (B.A.P. 1st Cir. 2003)). With respect to the willfulness requirement, "only acts done with the intent to cause injury—and not merely acts done intentionally—can cause willful and malicious injury." *In re Markowitz*, 190 F.3d 455, 464 (6th Cir. 1999). The malicious element requires that the injury be without just cause or excuse. *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). As long as these requirements are met, a debtor's conversion of a secured party's collateral may constitute willful and malicious injury for purposes of § 523(a)(6). *See Orix Credit Alliance, Inc. v. Cole (In re Cole)*, 199 B.R. 804, 805 (Bankr. M.D. Fla. 1996); *see also* 4 *Collier on Bankruptcy* ¶ 523.12[3] (16th ed. 2012) ("Secured creditors whose collateral was disposed of by the debtor often assert nondischargeability claims under § 523(a)(6) on the theory that the security interest was willfully and maliciously converted.").

In the present case, Hulsing asserts that the July 29, 2009 transfer of $4,886 from Sleep Quest's GreenBank account to SRS's account provides the factual basis for a nondischargeable debt pursuant to § 523(a)(6). According to Hulsing, upon the service of its garnishment on that same date, it had a lien on these funds, such that the transfer was a conversion of its lien interest. *See In re Eggleston*), 19 B.R. at 284 ("The service of the garnishment fixes a lien on the debt or effects in the hands of the garnishee . . . ."). However, Tennessee Rule of Civil Procedure 69.05(3) provides that "[w]here the garnishee is a financial institution, the balance in the judgment debtor's accounts on the night of the service date is the amount subject to that garnishment writ." Tenn. R. Civ. P. 69.05(3).[4]  On July 29, 2009, the balance in Sleep Quest's GreenBank account at the close of business was $0.17. Therefore, any lien interest held by Hulsing is limited to this negligible amount. In light of this legal conclusion, the court is unable to find that Hulsing has suffered an injury to its

---

[4] If the case were otherwise, Hulsing would have had a claim against the garnishee GreenBank for the transfer of the $4,886 in funds from the account. "[S]ervice of the garnishment upon the garnishee is a warning to the garnishee not to pay the debt but to answer the garnishment and hold the fund subject to the orders of the Court." *Dexter Ridge Shopping Center, LLC v. Little*, 358 S.W.3d 597, 605 (Tenn. App. 2010); *see also Stonecipher v. Knoxville Savs. & Loan*, 298 S.W.2d 785, 787 (Tenn. App. 1957) (judgment entered against garnishee in favor of judgment creditor where the judgment debtor had earnings for the month in which garnishment was served, but garnishee paid judgment debtor for commissions earned up to date of service of garnishment).

legal rights, i.e., conversion of its collateral, regardless of the alleged willfulness and maliciousness of the Debtors' conduct.  Accordingly, the Debtors are entitled to summary judgment on Hulsing's § 523(a)(6) cause of action as a matter of law.

IV.

For the reasons set forth above, Hulsing's motion for summary judgment is denied and the Debtors' motion for summary judgment is granted.

# # #